ORIGINAL

Approved: _____
Edward C. Robinson Jr.
Assistant United States Attorney

Before:  THE HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York

---

UNITED STATES OF AMERICA

v.

YOUNG FREEMAN PERRY,
a/k/a "Freeman Perry,"

Defendant.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 1343 and 2

COUNTY OF OFFENSE:
NEW YORK

23 MAG 03140

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATTHEW MAHAFFEY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
(Wire Fraud)

1. From in or about July 2019 through on or about February 24, 2023, in the Southern District of New York and elsewhere, YOUNG FREEMAN PERRY a/k/a "Freeman Perry", the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, transmitted and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, PERRY defrauded the victim (the "Victim") of $675,000 by promising to provide $4.5 million in financing for the Victim's company, never intending to provide such financing, and in connection therewith, fraudulently received funds from the Victim via interstate wire.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

2. I am a Special Agent with the FBI. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and interviews in which

I have participated. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. Based on my review of law enforcement reports, my review of documents and records received from the Victim of the fraud scheme, interviews of the Victim, and my review of court filings, I have learned that:

a. In or around May 2019, an individual (the "Victim") was seeking funding for his and his partners' specialty lending company focused on the financing of automobile purchases (the "Automobile Financing Company"). The Victim spoke with an individual ("Broker-1"), whom the Victim believed to be an unlicensed broker. Broker-1 agreed to assist in the raising of capital for the Automobile Financing Company.

b. In or around July 2019, Broker-1 introduced the Victim to another broker ("Broker-2"), who, according to Broker-1, had assisted Broker-1 with raising capital for business ventures.

c. On or about July 6, 2019, the Victim spoke with Broker-1 and Broker-2 (together, the "Brokers"). The Brokers explained that an associate, "Freeman Perry", the defendant, who was described as a billionaire, could provide the financing for the Automobile Financing Company. Broker-2 then acted as an intermediary between the Victim and PERRY.

d. In order for the Victim to obtain the $4.5 million in financing that he sought, Broker-1 and Broker-2 told the Victim that he needed to raise 15% of the amount of financing needed, i.e., $675,000 (the "Advance Fee") and send that amount to an escrow account located in New York belonging to PERRY's attorney (the "Escrow Attorney"), a partner at a firm based in New York (the "Firm").

e. In an email dated on or about August 8, 2019 from Broker-1 to the Victim, Broker-1 stated: "Escrow money returned as soon as loan/business line of credit is consummated. Funding takes 21-45 days." Broker-1 also provided a link to the website for the Escrow Attorney and his Firm. Upon receipt of the emails, the Victim arranged a call with Broker-1 and his partners to discuss the email. On the call, the Victim explained that he and his partners needed the Advance Fee returned in 45 days because two of the Victim's partners had taken money out of their individual retirement accounts and needed to return the money within 45 days to avoid tax penalties. Broker-1 assured the Victim and his partners that the $675,000 would be returned as soon as the line of credit was provided.

f. On or about August 30, 2019, the Victim received a call from Broker-2 and PERRY, who introduced himself as Freeman Perry and stated that he was an independently wealthy financier with assets in excess of $200 million. PERRY stated that he conducted business through various limited liability companies. PERRY described the details of the financing as $4.5 million line of credit at a 6.5 percent interest rate, with a 30-year amortization and 5-year payback.

PERRY told the Victim that he would finance the business line of credit himself utilizing his own assets and that the Advance Fee would be returned within 45 days.

   g. On or about September 3, 2019, a phone call took place between PERRY, the Victim, and the Victim's partners. PERRY stated that he was going to obtain a "grade A stock bond" to fund the letter of credit in the amount of $4.5 million, using his own personal assets. PERRY further stated that he would use the Advance Fee and his own money to obtain the $4.5 million line of credit.

   h. On or about September 4, 2019, Broker-2 emailed the Victim a draft escrow agreement. The escrow agreement was replete with errors. The Victim spoke to the Escrow Attorney, asking him to review and revise certain language in the escrow agreement. Later that day, the Escrow Attorney's assistant sent the Victim, copying PERRY, a draft escrow agreement marked up by hand. Afterwards, the Victim signed the marked-up escrow agreement (the "Escrow Agreement") and emailed it to Broker-2.

   i. The Escrow Agreement was between the firm, a limited liability company in which PERRY was the sole member (the "PERRY LLC"), and the Automobile Financing Company. The Escrow Agreement stated that the Advance Fee was for a "loan/credit line of $4,500,000.00." The Escrow Agreement further stated that the "[e]stimated time for underwriting 21 to 35 business days."

   j. The Victim raised $675,000 from friends and colleagues. On or about September 5, 2019, the Victim wired $675,000 to the Escrow Attorney in an account held by his Firm (the "Escrow Account"), based in New York, New York.

   k. On or about September 9, 2019, on a phone call, PERRY informed the Victim that he would provide the funding using the PERRY LLC, an entity that he utilizes for providing financing.

   l. On or about October 20, 2019, the 45-day deadline for return of the Advance Fee expired. The Advance Fee was not returned.

   m. On or about October 24, 2019, PERRY and an individual representing himself to be PERRY's investment advisor informed the Victim and his partners over the telephone that they would fund the $4.5 million line of credit within three weeks.

   n. In or around December 2019, PERRY informed the Victim by text that he was working on obtaining the loan/credit. Service provider records for the phone number that PERRY texted from show that the subscriber is "Young Perry."

   o. On or about January 28, 2020, the Victim texted PERRY: "We are now completing the fifth month that you've had our operational money while you keep kicking the can down the road. You're clearly hiding something and I'm now very concerned. . . Is there any kind of deal actually in place or is that a lie too."

p.  On or about April 29, 2020, the Victim texted PERRY: "I'm assuming based on your historical poor batting average and consistent broken promises that we will not be funded in April. You've had my money since September 2019."

q.  Over a year later, on or about June 9, 2021, the Victim texted PERRY: "I want to make this very clear: I do not want some structured finance deal with you. I don't want you to make any presentation on our behalf with any company to provide any form of financing. I want my money back. That's it."

r.  On or about May 31, 2022, the Victim filed a complaint (the "Lawsuit") in the U.S. District Court in the Northern District of Illinois against PERRY and the PERRY LLC, among others, for fraud, among other causes of action.

s.  On or about February 24, 2023, the parties reached a settlement. The Lawsuit was dismissed without prejudice as to PERRY and the PERRY LLC.

t.  As of April 18, 2023, the Victim and his partners have received approximately $432,972.00 of the Advance Fee.

u.  PERRY never provided the Victim with $4.5 million in financing.

### The Use of the Advance Fee

4.  Based on my review of bank records and law enforcement reports, I have learned the following about a series of transactions relating to the Advance Fee that occurred between on or about September 5, 2019 and on or about July 7, 2020:

a.  On or about September 5, 2019, the Escrow Account received the Advance Fee, $675,000, from the Victim.

b.  From on or about September 9, 2019 to on or about September 17, 2019, a total of $670,000.00 was transferred from the Escrow Account to a bank account under the name of PERRY LLC (the "PERRY LLC Account"), including a transfer of $605,000 from the Escrow Account to the PERRY LLC Account on or about September 17, 2019.

c.  On or about September 17, 2019, $200,000 was transferred from the PERRY LLC Account to PERRY's personal bank account (the "PERRY Personal Account"). At the time of the transfer, the balance for the PERRY Personal Account was $2,950.47. That same day, PERRY wired $115,548.22 from the PERRY Personal Account to a car company for the purchase of a 2016 Bentley Flying Spur.

d.  Between on or about September 11, 2019 to on or about July 7, 2020, a total of approximately $231,600 was transferred from the PERRY LLC Account to the PERRY Personal Account.

   e. On or about October 1, 2019, $75,000 was transferred from the PERRY LLC Account to another account in the name of an entity that lists PERRY as the signatory ("PERRY Account-1"). On or about November 18, 2019, $125,000 was transferred from the PERRY LLC Account to a different account in the name of an entity that lists PERRY as the signatory ("PERRY Account-2"). On or about December 30, 2019, $1,000 was transferred from the PERRY LLC Account to an account in PERRY's name ("PERRY Account-3").

   f. In addition to the transfer of $231,600 to the PERRY Personal Account, the PERRY LLC Account made a number of other payments, as follows:

    i. The PERRY LLC Account transferred $27,166.00 to an attorney representing a client who filed and settled a lawsuit alleging that PERRY had defrauded the client of approximately $326,000.

    ii. The PERRY LLC Account transferred $16,200.00 to a safekeeping receipts and asset manager services company.

    iii. The PERRY LLC Account transferred $13,100.00 to an individual.

    iv. The PERRY LLC Account transferred $57,000.00 to a bank.

    v. The PERRY LLC Account transferred $22,000.00 to an entity associated with Perry's investment advisor.

    vi. The PERRY LLC Account transferred $8,135.81 to a township. The expenditure appears to be for property taxes associated with a residence in the township that is owned by an entity owned by PERRY.

    vii. On or about January 10, 2020 and February 3, 2020, the PERRY LLC Account transferred $50,000 to the Victim's company in two wires of $25,000.

   g. Based on my training and experience, the expenditures associated with the PERRY LLC Account are consistent with personal use rather than financing purposes.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of YOUNG FREEMAN PERRY a/k/a "Freeman Perry", the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

_____
MATTHEW MAHAFFEY
Special Agent
Federal Bureau of Investigation

Sworn to me this 20th day of April, 2023.

_____
THE HONORABLE JENNIFER E. WILLIS
United States Magistrate Judge
Southern District of New York

6